# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2015

## STATE OF TENNESSEE v. BRANDON WAIRE

**Appeal from the Circuit Court for Maury County**
**No. 22134      Stella L. Hargrove, Judge**

_____

### No. M2014-02140-CCA-R3-CD – Filed March 30, 2016
_____

In December 2012, the Maury County Grand Jury indicted Brandon Waire ("the Defendant") on three counts of sale of cocaine over .5 gram within a drug-free zone. Following a trial, a jury convicted the Defendant as charged, and the trial court sentenced the Defendant to an effective eight years' incarceration. On appeal, the Defendant asserts that he is entitled to relief from his convictions because: (1) the trial court erroneously denied the Defendant's motion for mistrial after the State's confidential informant testified that he had served prison time with the Defendant; (2) the Defendant's right to a fair trial was violated when the State failed to preserve video evidence of statements made by the confidential informant in violation of State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (3) the trial court erred when it failed to exclude the State's late-disclosed witness from testifying; and (4) the evidence was insufficient to support his convictions. Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Brandon Waire.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Mike Bottoms, District Attorney General; and Brent Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Pretrial Motions*

This case arose out of three controlled drug buys conducted by the Columbia Police Department with the use of a confidential informant ("CI") named Kevin Otey. Prior to trial, the Defendant filed a motion in limine requesting that the trial court exclude a video recording of the second controlled drug buy on the basis that the State had failed to preserve on the video some of the statements made by Mr. Otey to law enforcement. At a hearing on the motion, defense counsel stated that the video should be excluded because, at the end of the video, Mr. Otey said he needed to tell the officer something and asked the officer to turn off the recording. Defense counsel argued that the State had a duty to preserve the evidence and to continue recording. He further argued that Mr. Otey possibly said something exculpatory regarding the Defendant after the recording was turned off. The prosecutor responded that the particular CI was an experienced informant and was aware that certain things should not be said on a recording. Furthermore, the prosecutor believed that the officer could testify that any statements made by Mr. Otey were not in any way exculpatory.

Thereafter, the State called Detective Jason Dark of the Columbia Police Department who testified that, during each of the three controlled drug buys, Mr. Otey was outfitted with a video and audio recording device. Detective Dark explained that the first buy took place on July 19, 2012, and was supposed to have been between the CI and a man named Terrance Martin. When Mr. Otey picked up Mr. Martin, they went to the Bel Air area where a third man became involved in the transaction. Detective Dark reviewed the video of this transaction but did not recognize the third man.

On July 25, 2012, Detective Dark set up a second drug buy using Mr. Otey. On this date, Mr. Otey was supposed to buy from Stephen Robinson a/k/a "Roc," whom Detective Dark had tentatively identified as the third man from the July 19 buy. However, when Mr. Otey arrived at the designated location for the drug buy, he realized that the unidentified man from the July 19 buy was "down the street." Mr. Otey approached that individual and purchased drugs from him. The recording device that had been provided to Mr. Otey captured the drug buy.

Detective Dark testified that he conducted a recorded, post-buy interview with Mr. Otey following the transaction, during which Mr. Otey stated he purchased the drugs from a man named "Brandon." Mr. Otey then indicated that he had something else to tell Detective Dark, and the officer shut off the video recording. Detective Dark explained

that he often used Mr. Otey for multiple purchases from different persons in a single day. He was concerned that Mr. Otey might mention one of the other transactions on the Defendant's video and shut off the recording. Detective Dark recalled that, when he shut off the recording, he said, "I thought it was Robinson. You know we thought it was Loc," to which the Mr. Otey responded, "[N]o, it was Brandon." Detective Dark and Mr. Otey then discussed the next controlled buy. Detective Dark testified that nothing Mr. Otey said after the video was turned off was of benefit to the Defendant.

Based upon this evidence, the trial court overruled the Defendant's motion stating that, even though the case "fit under the Ferguson obligation to preserve all of the evidence subject to discovery and inspection," Detective Dark did not violate the Defendant's rights when he stopped the video recording because the conversation was about "the next person they were going to buy from" and that there was some brief conversation between Mr. Otey and Detective Dark "on clearing up the name of who [Mr. Otey] had just bought from and the a.k.a. associated with it." The trial court suggested that the "cleaner thing" was to redact the entire post-buy interview. The Defendant agreed that the video should be redacted to exclude the post-buy interview if the trial court would not grant his request to exclude the entire video.

Before trial, the Defendant also filed a motion in limine requesting that the State redact from the videos of the controlled buys references to the Defendant's criminal history. The State agreed to the Defendant's request and announced that it would redact the videos accordingly. The Defendant filed another motion in limine that dealt with the Defendant's request to exclude his prior convictions under Rule 402, 403, 404, and 609 of the Tennessee Rules of Evidence. At the pretrial motion hearing, the trial court stated that it would take the motion under advisement and conduct a jury-out hearing if necessary. The State indicated that it would "not attempt to introduce any prior convictions in [its] case-in-chief."

Finally, the Defendant requested that the trial court exclude the State's proposed witness from New Harvest Child Care Agency ("New Harvest") from testifying. Defense counsel explained that he received an email from the prosecutor forty-eight hours before trial that contained a list of witnesses the State intended to call. However, there was one witness on the list—an unnamed individual from New Harvest—whom the State had not subpoenaed. Moreover, as of the pretrial hearing which took place the morning of trial, the prosecutor did not have the name of the witness from New Harvest that he intended to call. The Defendant argued that, under Rule 16 of the Tennessee Rules of Criminal Procedure, the State had a duty to provide him with a list of the names and current addresses of all witnesses it intended to call to testify, whether or not the witnesses were listed on the indictment. The prosecutor responded that the witness from New Harvest would testify that New Harvest was a licensed daycare that was in operation at the time

of the offenses and argued that defense counsel "ha[d] been practicing long enough to know" that the State would call such a witness. The prosecutor explained that, at the time of the indictment, the State did not know the name of a person from that agency who could be subpoenaed. The prosecutor informed the court that he had sent a representative to New Harvest (presumably that morning) with a blank subpoena "to find out which person there would be able and willing to come and testify today." Defense counsel acknowledged that he had been aware that New Harvest was listed on the indictment but, nonetheless, contended that the State had failed to provide notice of the particular witness thereby preventing the defense from investigating whether the witness could be impeached.

The trial court overruled the Defendant's motion to exclude the witness from New Harvest. However, to "avoid any prejudice at all that might result to the defendant," the trial court allowed defense counsel to speak to the witness before the witness testified "for as long as [defense counsel] wishes to do so."

*Trial*

At trial, Detective Jason Dark, a narcotics investigator for the Columbia Police Department, testified that, on July 19, 2012, he met with Kevin Otey—a CI who often made controlled buys for Detective Dark. Detective Dark recalled that Mr. Otey had initially offered his services as an informant because he needed "help with some charges"; however, Mr. Otey had continued his work as a CI to "make some money." When Detective Dark met with Mr. Otey on July 19, he provided Mr. Otey with $70 of "buy money," which was money that the detective had recorded and photocopied before giving to Mr. Otey. He then searched Mr. Otey and Mr. Otey's vehicle to ensure that the CI did not have any other money or drugs. Detective Dark also equipped Mr. Otey with a video and audio recording device. Before sending Mr. Otey to make the buy, Detective Dark announced for the recording that the subject of the investigation was Terrance Martin and that Mr. Otey was going to purchase cocaine from Mr. Martin.[1] Mr. Otey then left their location and went to East 17th Street where he picked up Mr. Martin. Detective Dark testified that he followed Mr. Otey in another vehicle as close as he could without being seen.

After Mr. Otey picked up Mr. Martin, they went to Elaine Drive, and Detective Dark monitored the drug buy from an adjacent street. During the buy, Detective Dark heard a third male voice on the audio surveillance and became aware that someone other

---

[1] Detective Dark testified that it was his practice, at the beginning of each recording of a controlled buy, to announce a "leader," wherein he stated his name, the date and time, and what the informant was going to do.

- 4 -

than Mr. Otey and Mr. Martin had become involved in the transaction. After the buy was completed, Mr. Otey took Mr. Martin back to East 17th Street, and Detective Dark followed Mr. Otey to a prearranged location. Detective Dark recovered the purchased narcotics from Mr. Otey and went over what had happened with Mr. Otey. Detective Dark then paid Mr. Otey $250—$125 for each dealer that day. Detective Dark testified that he also recovered the recording of the transaction from Mr. Otey, and the recording was played for the jury.

Detective Dark stated that he conducted a field test on the purchased substance and later sent the substance to the Tennessee Bureau of Investigation (TBI) crime lab for testing. Detective Dark testified that, although Mr. Otey had ordered a gram of cocaine from Mr. Martin, Mr. Otey received significantly less than one gram. He stated that, in his experience, it was not unusual for cocaine dealers to fail to deliver the full amount.

Detective Dark testified that he and Mr. Otey conducted a second controlled drug buy on July 25, 2012. Before the buy took place, Detective Dark and other vice officers searched Mr. Otey and Mr. Otey's vehicle, and he again provided Mr. Otey $70 in buy money. On the recording device, Detective Dark announced that Mr. Otey would be buying from Stephen Robinson. Detective Dark testified that, at that time in the investigation, he believed that Mr. Robinson was the person who lived on Elaine Drive where Mr. Otey had previously purchased drugs. However, once the second drug deal was completed, Detective Dark learned that it was the Defendant and not Mr. Robinson who had sold Mr. Otey cocaine on both occasions. The video recording of the July 25th drug transaction was played for the jury, and Detective Dark identified the Defendant on the video as the person who had sold Mr. Otey cocaine.

On August 1, 2012, Detective Dark met with Mr. Otey for a third time. The detective announced on that day's recording that Mr. Otey was going to attempt to purchase cocaine from the Defendant. He provided Mr. Otey with $140 so that Mr. Otey could buy two grams of cocaine. The recording from this transaction was played for the jury. Based upon his review of the recordings, Detective Dark maintained that the Defendant was on each of the three videos and that the Defendant had sold Mr. Otey cocaine on each occasion. He stated that, on July 19, Mr. Otey handed the buy money to Mr. Martin and then Mr. Martin handed the money to the Defendant.

Detective Dark testified that, after the three controlled buys, he determined that all three had taken place within 1,000 feet of New Harvest Daycare. He used a computer program provided by the City of Columbia planning division to pinpoint where each buy took place and measure the distance between the location of the buy and the daycare. Detective Dark determined that the first transaction occurred 440 feet away from New

Harvest. The second two transactions occurred at the same location, approximately 341 feet from New Harvest.

On cross-examination, Detective Dark acknowledged that Mr. Otey had been "[i]n and out of trouble[.]" He stated that Mr. Otey had pending charges on July 19, 2012, but that no promises were made to Mr. Otey in exchange for his conducting the controlled buys with the Defendant. Moreover, Detective Dark did not know whether those same charges were still pending against Mr. Otey. Detective Dark recalled that Mr. Otey spoke to Mr. Martin by phone before the controlled buy on July 19. Detective Dark stated that he could not remember if he personally searched Mr. Otey before the first controlled buy but that either he or his partner would have searched Mr. Otey. Detective Dark acknowledged that there was an unidentified woman on the second recording that Mr. Otey interacted with and that he did not search Mr. Otey following his interaction with the unidentified woman to determine if there had been any sort of drug transaction between them. Detective Dark recalled that, after the second drug buy, Mr. Otey told him the Defendant was the individual Mr. Otey had previously identified by the nickname "Loc."

Kevin Otey testified that he was thirty-four years old and that he had used drugs since he was seventeen or eighteen. Mr. Otey admitted that he began selling crack cocaine when he was fifteen or sixteen and was first charged with the offense in juvenile court when he was seventeen years old. He recalled that he received an eighteen-month jail sentence after the charge was transferred from juvenile court. Despite the time in jail, Mr. Otey continued to sell drugs, and he later received additional charges for selling cocaine. Mr. Otey stated that, in addition to drug charges, he had convictions for arson, evading arrest, and reckless endangerment. He further acknowledged that, at the time of the Defendant's trial, he had pending charges for selling cocaine and he was facing a prison sentence of at least twenty-four years. Mr. Otey testified that he first spoke to Detective Dark after he was arrested on his pending charges and that he offered to help law enforcement by "doing drug deals." However, Mr. Otey testified that he had not been promised help on his pending charges based on working for Detective Dark.

Mr. Otey stated that, on July 19, 2012, he met with Detective Dark and the detective searched his vehicle, provided him with money to purchase drugs, and equipped him with a recording device. Mr. Otey testified that he had no money, other than that provided by Detective Dark, and no drugs on him when he went to make the controlled buy. Mr. Otey recalled that he had made arrangements to meet with Mr. Martin at Mr. Martin's house and that Mr. Martin was supposed to sell him drugs during the buy. Mr. Otey met with Mr. Martin and then drove Mr. Martin to Bel Air to a location on Elaine Drive. When they arrived, Mr. Otey gave Mr. Martin money to purchase the cocaine. The Defendant, whom Mr. Otey recognized, then approached the vehicle. Mr. Otey

stated that he observed the Defendant give Mr. Martin crack cocaine in exchange for the money. During their brief interaction, Mr. Otey told the Defendant that he had lost the Defendant's phone number. The Defendant then directed Mr. Martin to give Mr. Otey the Defendant's number, and Mr. Martin complied. Mr. Otey testified that he took Mr. Martin back to Mr. Martin's residence after the drug buy. At that time, Mr. Otey asked Mr. Martin for a cigarette, which Mr. Martin retrieved from inside his residence and gave to Mr. Otey. Mr. Otey testified that he called Detective Dark after dropping off Mr. Martin and then met the detective at a prearranged location. There, he provided Detective Dark with the cocaine he purchased from the Defendant. He told the detective that he did not remember the Defendant's name but that he thought the Defendant's nickname was "Loc." Mr. Otey identified the Defendant in the video recording of the transaction when it was played for the jury.

At one point in the State's direct examination of Mr. Otey, the following exchange took place regarding the first controlled buy:

Q. Okay. And after you gave Mr. Martin the money and you saw [the Defendant] and he walked up to the truck, what happened then?

A. I knew who he was.

Q. Okay. Now, did you know his name or did you just recognize his face?

A. I recognized his face.

Q. Okay. I mean it sounds like you and him recognized each other on the video; is that right?

A. Yeah, we did five years together.

Immediately thereafter, defense counsel requested a bench conference during which he argued that the trial court should declare a mistrial based upon Mr. Otey's statement that they "did five years together" because it implied the Defendant had served time in prison. The prosecutor responded that he did not ask a question intending to elicit that response and that Mr. Otey's statement could be interpreted several different ways. The State suggested that the trial court instruct the jury that it should disregard Mr. Otey's last comment. The trial court ruled that there was not a manifest necessity for a mistrial. The court found that Mr. Otey "volunteer[ed]" the statement and that it had not been elicited by the State's question. The court then provided the jury with a curative

- 7 -

instruction, stating, "Ladies and gentlemen, please disregard totally that last statement on the part of Mr. Otey."

Mr. Otey's testimony then moved to his recollection of a second controlled buy with the Defendant that occurred on July 25, 2012. Mr. Otey explained that he was supposed to purchase cocaine from the Defendant on that day but that he still did not know the Defendant's real name. Mr. Otey stated that, in addition to attempting to buy cocaine from the Defendant, he intended to buy Lortabs from "[s]ome female" who lived on Elaine Drive. However, Mr. Otey acknowledged that Detective Dark announced on the recording that Mr. Otey was attempting to buy from Stephen Robinson. Mr. Otey explained that there were two men in Columbia with the nickname "Loc" and that, when law enforcement looked up the nickname, they identified Mr. Robinson as "Loc."

Mr. Otey testified that, when he got to the residence on Elaine Drive, he got out of his vehicle and began walking towards the house where he thought the Defendant lived. However, Mr. Otey heard the Defendant calling his name from "[d]own the street on Elaine Drive" about three or four houses away. Mr. Otey explained that he had called the Defendant earlier that day to set up the buy, so the Defendant had been expecting him. As the video recording of the second transaction was shown, Mr. Otey acknowledged that there were two unidentified women in the video. He stated that he did not know these women and that he had no interaction with them. Mr. Otey identified the Defendant on the video and testified that, during this transaction, the Defendant got into his vehicle. Mr. Otey then gave the Defendant the buy money, and the Defendant gave Mr. Otey cocaine in return. Mr. Otey told the Defendant that he was also going to purchase Lortabs from a woman at the first residence. However, Mr. Otey testified that the transaction did not take place because the Defendant called the woman, and she stated she had no Lortabs. Following the buy with the Defendant, Mr. Otey called Detective Dark and met him at a prearranged location where he gave Detective Dark the cocaine he had purchased from the Defendant. Mr. Otey testified that he remembered the Defendant's name that day after "being around him."

Mr. Otey testified that a third controlled buy took place on August 1, 2012, after he called the Defendant and arranged to purchase cocaine from him. Mr. Otey recalled that officers searched him and his vehicle and that Detective Dark gave him buy money for the transaction. Mr. Otey then drove to the same location on Elaine Drive where he met with the Defendant on July 25. When he arrived, Mr. Otey got out of his car because he wanted to be in a better position to capture the transaction on video. While standing at the back of his car, Mr. Otey told the Defendant that one of his speakers in the trunk was "messed up." The Defendant approached the trunk of the car and placed the requested cocaine on a mat inside the trunk. The Defendant then picked up the buy money that Mr. Otey had placed on the mat beside the drugs. Following the exchange, Mr. Otey left the

- 8 -

location and met with Detective Dark. He testified that, after the buy, officers again searched him and his vehicle.

On cross-examination, Mr. Otey testified that he knew Mr. Martin because he had been in a gang with Mr. Martin previously. He stated that, before the first buy on July 19, one officer searched him while two other officers searched his car. Mr. Otey carried none of his own cash when he went to purchase the cocaine but only what Detective Dark had provided him. Mr. Otey testified that he initially began assisting law enforcement as a CI in order to get help on pending charges. However, by the time he assisted in the controlled buys involving the Defendant, Mr. Otey was working with Detective Dark for financial reasons. Mr. Otey reiterated that he did not interact with or obtain drugs from the two unidentified women in the video from July 25. Although he could not recall the specific amount of money provided to him by Detective Dark on the three occasions, Mr. Otey stated that he gave all of the buy money to the Defendant on those occasions. Mr. Otey acknowledged that, at the time of trial, he had several criminal charges that had been pending since 2011. However, he stated that he had received no promises about the outcome of those charges. He agreed that he would likely be convicted on the offenses but that he was hoping "not to go to prison."

During a break in proceedings, defense counsel again requested a mistrial based upon Mr. Otey's statement. Defense counsel argued that Mr. Otey's testimony indicated that the Defendant and Mr. Otey had been in prison together. The prosecutor again responded that he had not elicited the statement and that Mr. Otey's statement was not specific. The prosecutor noted that the trial court had instructed the jury to disregard the statement and that jurors are presumed to have followed the instruction. He argued that, in light of the entire record, the statement was not a basis for a mistrial. Defense counsel agreed that the prosecutor did not elicit the response from Mr. Otey. The trial court then found that Mr. Otey's statement did not rise to the level of a manifest injustice necessitating a mistrial.

Special Agent Cassandra Beavers, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in identification of controlled substances. Ms. Beavers stated that, based upon her analysis, each of the substances that Mr. Otey had obtained from the Defendant was "heavily cut" cocaine. She determined that the first sample weighed .63 gram, the second weighed .73 gram, and the third sample weighed 1.35 grams.

Finally, Paula McCullen testified that she was the director at New Harvest Child Care Center, which was a daycare connected with the New Harvest Family Church. Ms. McCullen stated that New Harvest was licensed through the State and in operation in July

and August of 2012. She identified the location of New Harvest on a map and explained that it was on McGuire Street in Columbia.

Based upon this proof, the jury convicted the Defendant as charged. Following a sentencing hearing, the trial court sentenced the Defendant, as a Range II offender, to concurrent terms of fifteen years on each count. Thereafter, the Defendant filed a motion for new trial. At a hearing on the Defendant's motion, the parties agreed that the Defendant was improperly classified as a Range II offender and that he was a Range I offender. The trial court then resentenced the Defendant, as a Range I offender, to concurrent terms of eight years on each count. The trial court denied the Defendant's motion for new trial as to all other grounds. This timely appeal followed.

## II. Analysis

### *Motion for Mistrial*

The Defendant contends that the trial court abused its discretion when it denied his request for a mistrial after Mr. Otey stated, "[W]e did five years together." The Defendant asserts that the statement indicated that he had spent time in prison which, in turn, informed the jury that he had a prior criminal conviction. He argues that the statement was inadmissible under Rule 404(b) of the Tennessee Rules of Evidence and that a mistrial was necessary because the statement "destroyed any chance the [Defendant] had at an impartial verdict" despite the trial court's curative instruction. The State responds that the trial court properly denied the Defendant's request for a mistrial because the Defendant failed to establish a manifest necessity for a mistrial. The State asserts that the prosecutor did not elicit the statement, the trial court gave a curative instruction, and the proof of the Defendant's guilt was overwhelming. We agree with the State.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Id. This court will not disturb the trial court's decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and

(3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

In support of his argument, the Defendant relies heavily upon State v. Demetrius Holmes, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517 (Tenn. Crim. App. Nov. 30, 2001), no perm. app. filed. In Demetrius Holmes, the defendant was charged with an aggravated robbery that occurred when the defendant, armed with a gun, entered the victim's residence and demanded money from the victim. Id. at *1. Before trial, the court instructed the parties not to discuss any prior bad acts of the defendant. Id. at *2. Thereafter, a detective who was present when the trial court made this instruction testified that the defendant was "well known for home invasions." Id. On appeal, this court determined that the evidence was inadmissible and "particularly damaging" because it "informed the jury that the defendant had a reputation for committing crimes similar to the offense on trial." Id. at * 3. This court additionally stated that the detective was aware of the trial court's ruling and had "circumvented the court's ruling[.]" Id. at *4. Moreover, this court characterized the State's evidence as "not great" and noted that the trial court failed to give a contemporaneous curative instruction. Id.

The facts in this case are readily distinguishable from those in Demetrius Holmes and weigh against the granting of a mistrial. As found by the trial court and conceded by defense counsel at trial, the prosecutor did not elicit the testimony from Mr. Otey; rather, Mr. Otey volunteered the statement. The statement was brief and non-specific, and the prosecutor immediately tried to move to another question. Moreover, the trial court gave a contemporaneous curative instruction that the jury was not to consider the statement, and jurors are presumed to follow the instructions of the trial court. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). Finally, the State's proof against the Defendant was strong. In addition to Mr. Otey's testimony about the three transactions, the transactions were each recorded on video. The Defendant is visible in each of the transactions, and the recordings were played for the jury.

Based upon the foregoing, we conclude that the Defendant failed to establish a manifest necessity for a mistrial. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1995) (finding that the trial court properly denied a mistrial based upon a witness's improper statement that the defendant had previously been in jail because the witness's statement was "unresponsive and unsolicited" and was followed by a curative instruction from the trial court); State v. Marcus Smartt, M2014-01093-CCA-R3-CD, 2015 WL 3563024, at *6 (Tenn. Crim. App. June 9, 2015), no perm. app. filed (stating that "[a]ppellate courts have previously upheld a trial court's refusal to declare a mistrial after a passing reference to the defendant's prior imprisonment"). The trial court did not abuse its discretion.

In his second issue, the Defendant contends that his right to a fair trial was violated because the State failed to preserve the video evidence of the CI's statements following the second drug buy in violation of State v. Ferguson. The Defendant argues that once the State undertakes to create a recording that will be used against a defendant at trial, it has a duty to create a full, accurate, and complete recording. He contends that, based upon the State's failure to create a complete recording, the trial court should have excluded the video of the second drug buy in its entirety or dismissed that count of the indictment. The State responds that the trial court properly allowed the State to introduce the recording of the second drug transaction because the Defendant failed to establish a Ferguson violation.

In Ferguson, our supreme court explained that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." State v. Merriman, 410 S.W.3d 779, 784 (Tenn. 2013) (citing Ferguson, 2 S.W.3d at 915-16). The court determined that the due process required under the Tennessee Constitution was broader than that required under the United States Constitution and rejected the "bad faith" analysis adopted by the United States Supreme Court in Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Id. at 784-85. Instead, the court in Ferguson adopted a balancing approach where a trial court must determine "[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair." Id. at 785 (quoting Ferguson, 2 S.W.3d at 914). "[B]ad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." Id.

When a defendant raises a Ferguson claim, a trial court must first "determine whether the State had a duty to preserve the evidence." Merriman, 410 S.W.3d at 785. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" Id. (quoting Ferguson, 2 S.W.3d at 917). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (footnote omitted).

If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Ferguson, 2 S.W.3d at 917 (footnote omitted). The trial court is required to balance these factors to determine whether conducting a trial without the missing evidence would be fundamentally fair. Merriman, 410 S.W.3d at 785. "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Id.

This court applies a de novo standard of review to the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence. Id. at 791. The trial court's findings of fact, however, are entitled to substantial deference on appeal and are conclusive unless the evidence preponderates against them. See id. (citing Tenn. R. App. P. 13(d); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). We review the trial court's choice of remedy for a Ferguson violation under the abuse of discretion standard. Id.

The Defendant's reliance on Ferguson in this instance is misplaced. Ferguson applies to the loss or destruction of evidence; it does not require the creation of evidence. State v. Angela K. Pendergrass, No. E2013-01409-CCA-R3-CD, 2014 WL 1232204, at *7 (Tenn. Crim. App. Mar. 25, 2014), perm. app. denied (Tenn. Aug. 26, 2014) (denying relief on the defendant's claim of a Ferguson violation based upon the State's failure to record the defendant during the administration of the breath test); see also Merriman, 410 S.W.3d at 794 (stating that the officer "had no duty to create a video recording of [the defendant's] traffic stop"); State v. Joshua Eugene Anderson, No. E2005-02660-CCA-R3-CD, 2007 WL 1958641, at *8 (Tenn. Crim. App. July 6, 2007), perm. app. denied (Tenn. Apr. 7, 2008) (indicating that the State has no duty to preserve what was never created). The State preserved the video recording of the second drug buy upon which the Defendant appears. Detective Dark did not have a duty to continue recording after the offense was over, and he was under no duty to record his entire conversation with Mr. Otey. The State had no duty to create this additional evidence, and therefore, it had no duty to preserve the evidence. Furthermore, the Defendant failed to establish that the conversation between Detective Dark and Mr. Otey possessed any apparent exculpatory value. The trial court accredited Detective Dark's testimony that Mr. Otey did not

- 13 -

provide any exculpatory information regarding the Defendant. Mr. Otey merely reiterated what he had already said on the recording—that it was the Defendant and not Mr. Robinson that he had purchased drugs from.

Based upon the foregoing, we cannot conclude that the Defendant's right to a fair trial was violated by the trial court's refusal to exclude the video of the second controlled drug buy. The Defendant is not entitled to relief.

*Failure to Exclude Ms. McCullen's Testimony*

Next, the Defendant asserts that the trial court erred when it failed to exclude Ms. McCullen's testimony. He argues that the trial court should have excluded Ms. McCullen's testimony because the State did not disclose the witness until less than forty-eight hours before trial in violation of Rule 16 of the Tennessee Rules of Criminal Procedure. The Defendant claims that he was prejudiced by the trial court's ruling because he was not "able to investigate the background of this witness and interview her prior to trial." The State responds that the trial court properly exercised its discretion when it allowed Ms. McCullen to testify because the Defendant failed to show that he was prejudiced by any delay in notice, that the State gained any undue advantage from the late disclosure, or that the State acted in bad faith. We agree with the State.

Initially, we note that Rule 16 of the Tennessee Rules of Criminal Procedure "does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses." State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992) (citing State v. Martin, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982)). Thus, the Defendant's reliance on Rule 16 is misplaced. Nevertheless, Tennessee Code Annotated section 40-17-106 provides that:

> It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto.

Tenn. Code. Ann. § 40-17-106. "The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof." State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). However, the statute is merely directory and does not impose a mandatory duty on the prosecutor. Id. Failure to include a witness's name on the indictment does not necessarily disqualify the witness from testifying. Harris, 839 S.W.2d at 69. A defendant will be granted relief

for nondisclosure of a witness "only if he or she can demonstrate prejudice, bad faith, or undue advantage." Kendricks, 947 S.W.2d at 883. In the context of an undisclosed witness, "it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." Id. The decision of whether to allow the witness to testify is left to the sound discretion of the trial court. Id. (citing State v. Underwood, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984)).

Here, the Defendant objected to the testimony of Ms. McCullen because the State did not provide notice of its intent to call a witness from New Harvest daycare until forty-eight hours before trial. During the hearing on the Defendant's motion to exclude Ms. McCullen's testimony, the Defendant acknowledged that he had been aware that New Harvest was listed on the indictment as the child care agency the State alleged was within 1,000 feet of the location of the drug transactions. He asserted, however, that the late notice prevented him from investigating Ms. McCullen for possible impeachment material. Although the State did not comply with the directory statute, we conclude that the Defendant failed to show "prejudice, bad faith, or undue advantage." See Harris, 839 S.W.2d at 69. The trial court allowed defense counsel the opportunity to speak to Ms. McCullen "for as long as [defense counsel] wishe[d] to do so," and the scope of Ms. McCullen's testimony was limited—she testified only that New Harvest was a daycare in operation at the time of the offenses. At the hearing on his motion for new trial, the Defendant offered no evidence of any impeachment material that he could have used against Ms. McCullen if he had had additional time to investigate this witness. Moreover, the Defendant has not asserted that the State acted in bad faith or gained an undue advantage. Thus, we hold that the trial court did not abuse its discretion in allowing Ms. McCullen to testify. The Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Finally, the Defendant challenges the sufficiency of the evidence. Specifically, the Defendant acknowledges that Mr. Otey identified him as the person who sold the cocaine on each of the three occasions and that the Defendant can be seen in each of the video recordings. However, he argues that the evidence is insufficient because Mr. Otey failed to obtain video of the Defendant "making any drug sale," despite being equipped with a recording device, and that other people were seen in two of the videos who presumably could have given Mr. Otey the drugs. The State responds that the State presented sufficient evidence for the jury to convict the Defendant of three counts of sale of cocaine over .5 gram in a drug-free zone. We agree with the State.

- 15 -

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

The Defendant stands convicted of three counts of sale of cocaine .5 gram or more within a drug-free zone. In order to support his convictions, the State had to prove that the Defendant sold cocaine in an amount over .5 gram within 1,000 feet of a child care agency. See Tenn. Code Ann. §§ 39-17-417(a)(3), -417(c)(1), -432(b)(1) (2012).

Viewed in the light most favorable to the State, the evidence supports the jury's determination that it was the Defendant who sold over .5 gram of cocaine to Mr. Otey on three separate occasions. Mr. Otey testified that he purchased cocaine from the Defendant on July 19, July 25, and August 1, 2012. Prior to each transaction, officers searched Mr. Otey and his vehicle, and Detective Dark provided Mr. Otey with money to purchase cocaine and equipped him with a recording device. Mr. Otey and Detective Dark identified the Defendant on each of the video recordings, and those recordings were

shown to the jury. Thus, the evidence supports the jury's finding that the Defendant was the person who sold Mr. Otey cocaine.

The evidence further establishes that the substance purchased from the Defendant by Mr. Otey during each transaction was cocaine and weighed in excess of .5 gram. Detective Dark testified that, after each transaction, he obtained the purchased substances from Mr. Otey, field-tested the substances, and sent them to the TBI lab for analysis. Agent Beavers testified that her analysis showed that each of the three substances contained cocaine. She determined that the first sample weighed .63 gram, the second weighed .73 gram, and the third sample weighed 1.35 grams.

Finally, the evidence supports the jury's finding that the transactions occurred within 1,000 feet of a child care agency. Detective Dark testified about the locations of each of the drug transactions and how he determined through a mapping program that the locations were within 1,000 feet of New Harvest. Ms. McCullen then testified that New Harvest was a licensed daycare in operation in July and August 2012. Taking all of this evidence and the Defendant's arguments into consideration, we conclude that the State presented sufficient evidence to convict the Defendant of three counts of sale of more than .5 gram of cocaine in a drug-free zone.

## Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE